IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2018

**IN RE ALEXIS S. ET AL.**

**Appeal from the Juvenile Court for Overton County**
**No. 17-JV-96     Daryl Colson, Judge**

_____

**No. M2018-00296-COA-R3-PT**
_____

This is a termination of parental rights case involving the parental rights of the mother, Lequita S. ("Mother"), to her minor children, Alexis S., Jaxon S., and Jasmine S. (collectively, "the Children"). The Children were born in 2011, 2014, and 2017, respectively, to Mother and Jerry S. ("Father"). In November 2016, the Overton County Juvenile Court ("trial court") entered an order removing Alexis and Jaxon from the parents' custody and placing the two children into the temporary legal custody of the Tennessee Department of Children's Services ("DCS"). These children were immediately placed in foster care, where they remained at the time of trial. The trial court subsequently entered an order on February 15, 2017, wherein the trial court found that Alexis and Jaxon were dependent and neglected due to the parents' drug abuse and unsuitable home. Jasmine was placed into the same foster home as her siblings following her birth in June 2017, and the trial court entered an order on October 4, 2017, finding Jasmine to be dependent and neglected. On October 19, 2017, DCS filed a petition to terminate Mother's and Father's parental rights to the Children. Following a bench trial, the trial court terminated Mother's parental rights to the Children upon determining by clear and convincing evidence that (1) Mother had abandoned the Children by failing to provide a suitable home for them, (2) Mother had abandoned the Children by her willful failure to visit them, (3) Mother had demonstrated substantial noncompliance with the permanency plans, (4) Mother had committed severe child abuse against Jasmine, (5) Mother had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children, and (6) the conditions leading to removal still persisted and a return of custody would in all probability cause the Children to be subjected to further abuse and neglect.[1] The trial court further found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. Mother has appealed. Discerning no reversible error, we affirm.

_____

[1] The trial court also terminated Father's parental rights to the Children. Father has not appealed the termination of his parental rights. We will therefore confine our analysis to those facts relevant to Mother.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Bruce E. Myers, Livingston, Tennessee, for the appellant, Lequita S.

Herbert H. Slatery, III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.  Factual and Procedural Background

In 2016, DCS commenced dependency and neglect proceedings concerning Alexis and Jaxon after DCS received a referral regarding the two children's purported lack of supervision, drug exposure, and environmental neglect in the parents' home.  Local law enforcement officials arrested the parents on or around July 1, 2016, for child abuse and neglect following the discovery of Alexis wandering in the road near the family's residence.  The parents' whereabouts were unknown.  The trial court conducted a hearing on November 2, 2016, and subsequently placed Alexis and Jaxon in the custody of DCS, finding that the safety of the two children could not be adequately protected by leaving them in the care of the parents.

Upon subsequent hearing, the trial court entered an order on February 15, 2017, finding that the two children were dependent and neglected and should remain in foster care but reserving its ruling with respect to the allegations of severe child abuse. Furthermore, Mother was directed to submit to medical detoxification for the purpose of protecting her unborn child.  Mother was subsequently taken into custody for that same reason.  On June 5, 2017, Mother gave birth to Jasmine.  On June 6, 2017, DCS filed a petition for emergency temporary legal custody of Jasmine, which the trial court granted that day.  In an order entered on October 4, 2017, the trial court determined that DCS had shown by clear and convincing evidence that Jasmine was dependent and neglected within the meaning of applicable law and that the parents had committed severe child abuse against Jasmine as defined by Tennessee Code Annotated § 37-1-102(b)(22) (Supp. 2017).[2]  The trial court concomitantly entered a second order with respect to Alexis and

---

[2] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 37-1-102(b) to include several additional definitions within the section.  *See* 2018 Tenn. Pub. Acts, Ch. 1052, § 5 (H.B.

Jaxon, again finding the two children to be dependent and neglected but not finding them to be victims of severe child abuse at the hands of the parents.

According to the findings of the trial court in its October 4, 2017 order concerning Jasmine, Mother knew that she was pregnant as early as November 2, 2016. Between discovery of her pregnancy and the birth of Jasmine, Mother exhibited continuing drug abuse and noncompliance with drug and mental health treatment programs. Consequently, the trial court found that Mother had committed severe child abuse pursuant to the statutory definition. Neither of the trial court's October 4, 2017 orders was appealed.

On October 19, 2017, DCS filed a petition to terminate Mother's and Father's parental rights to the Children based on the statutory grounds of (1) abandonment by willful failure to support, (2) abandonment by willful failure to visit, (3) abandonment by failure to establish a suitable home, (4) substantial noncompliance with the permanency plans, (5) severe child abuse against Jasmine, (6) failure to manifest an ability and willingness to assume custody or financial responsibility of the Children, and (7) persistence of the conditions leading to the Children's removal from the parents' custody. As pertinent to this appeal, DCS alleged that termination of Mother's parental rights was in the best interest of the Children due to (1) Mother's failure to effect a lasting adjustment of her circumstances despite reasonable efforts by DCS, (2) Mother's lack of regular visitation or contact with the Children, (3) the lack of a meaningful relationship between the Children and Mother, (4) the court's prior finding of Mother's severe abuse of Jasmine, (5) Mother's continuing substance abuse, (6) Mother's untreated mental health issues, (7) Mother's lack of interest in the welfare of the Children, (8) the Children's bond with their foster parents and the foster parents' wish to adopt the Children, and (9) Mother's prior surrender of parental rights to her three other children from a previous marriage.[3]

The trial court conducted a hearing on December 20, 2017, considering testimony from Lindsey Witcher, the DCS case worker assigned to the Children; the DCS case

2271). The amendment did not alter the definition of "severe child abuse" as referenced by the trial court, but the subsection defining "severe child abuse" was moved from § 37-1-102(b)(22) to § 37-1-102(b)(27). Inasmuch as the instant action was filed in October 2017 and the trial court referenced the pertinent subsection under its previous designation, we will refer to the applicable subsection by its 2017 codification.

[3] The record indicates that Mother surrendered her parental rights to three other children in 2010. This prior surrender of rights, as the trial court explained in its December 20, 2017 hearing, is useful "only as a reference to gauge whether or not there is a substantial likelihood that [Mother] will make meaningful changes to her home that would justify giving her an opportunity to do so."

worker assigned to Father's live-in girlfriend; the in-home therapist assigned to the parents from November 2016 through January 2017; Michael Hill, the counselor for Alexis; the Children's foster mother; and Father.[4] The trial court also entered into evidence the deposition of a psychological examiner who conducted an evaluation of Father. Following the bench trial, the court granted DCS's petition for the termination of Mother's parental rights in an order entered January 19, 2018, determining that DCS had proven each of its grounds for termination alleged with respect to Mother by clear and convincing evidence and that termination of Mother's parental rights was in the best interest of the Children. Mother timely appealed.[5]

## II. Issues Presented

Mother presents six issues for our review, which we have restated slightly as follows:

1.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Mother's abandonment of the Children by her willful failure to visit.

2.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Mother's abandonment of the Children based on Mother's failure to provide a suitable home.

3.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Mother's substantial noncompliance with the permanency plans.

---

[4] Although the parents were residing together upon the commencement of these proceedings, Father separated from Mother at some time prior to the hearing and filed for divorce on October 19, 2017. At the time of the December 20, 2017 hearing, Father was cohabitating with another person, the divorce had not been finalized, and Mother's residence was unknown.

[5] Mother's notice of appeal was incorrectly filed with the trial court instead of the appellate court clerk on February 16, 2018. *See* Tenn. R. App. P. 4 (2017). Mother did not file her notice of appeal with the appellate court clerk until February 20, 2018. Under the then-active transitional provision of Tennessee Rule of Appellate Procedure 4, Mother's notice of appeal was allowed twenty additional days for filing, counting from the thirtieth day after entry of the final judgment. *See* Tenn. R. App. P. 4(a) (2017). Mother's filing of her notice of appeal in the trial court was within the thirty-day period ordinarily allowed for appeals, and her re-filing in this Court was within the additional twenty-day period allowed by the transitional provision. We have therefore considered Mother's notice of appeal to be timely. *See id.* ("[A] notice of appeal filed with the appellate court clerk during the additional period allowed by this transitional provision shall be deemed to have been timely filed.").

4.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of severe child abuse committed by Mother against Jasmine.

5.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Children.

6.      Whether the trial court erred by finding clear and convincing evidence that the termination of Mother's parental rights was in the best interest of the Children.

III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a

5

decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

In the case at bar, the trial court determined that clear and convincing evidence supported the existence of the following six statutory grounds for termination of Mother's parental rights: (1) abandonment by willful failure to visit, (2) abandonment by failure to provide a suitable home, (3) substantial noncompliance with the permanency plans, (4) severe child abuse committed against Jasmine, (5) failure to manifest an ability and willingness to assume custody or financial responsibility for the Children, and (6) persistence of the conditions leading to the Children's removal. Although Mother has not appealed the trial court's determination concerning the statutory ground of failure to manifest an ability and willingness to assume custody or financial responsibility for the Children, we will nonetheless address this ground and each statutory ground found in turn. *See In re Carrington H.*, 483 S.W.3d at 525.

A. Abandonment by Willful Failure to Visit

Tennessee Code Annotated § 36-1-113(g)(1) (2017) provides, as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

7

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Our statutory scheme defines abandonment by a parent's willful failure to visit as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E) (2017). This Court has previously explained that "[f]ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). In this case, the trial court found that Mother (1) "was aware of her duty to visit the children"; (2) "knew the children were in foster care and knew how to schedule visits"; (3) "made no attempt to visit the children since February 4, 2017"; and (4) "provided no justifiable excuse for failing to visit the children." Mother contends that any failure to visit was not willful because she had been incarcerated for a total of sixty-seven days between January 27, 2017, and November 14, 2017, which prevented her from visiting the Children. Upon a thorough review of the record and applicable law, we disagree.

We note at the outset that according to testimony from Ms. Witcher, the DCS family services worker assigned to this matter, the final time Mother visited the Children was prior to February 4, 2017, the date upon which Mother's visitation was suspended due to substance abuse. [6] Ms. Witcher testified that Mother was allowed two therapeutic visits per month, knew how to schedule these visits, and was aware of her duty to visit the Children. Ms. Witcher also testified that she explained to Mother the steps Mother could take in order to have her visitation rights reinstated. The record demonstrates that Mother had made no attempts to visit Alexis or Jaxon after February 4, 2017, at the latest and that Mother had never attempted to visit Jasmine.

Ordinarily, the four-month statutory period for determining abandonment in such a proceeding would be from June 19, 2017, through October 18, 2017, which period represents the four consecutive months immediately preceding the filing of termination proceedings in the trial court. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017). According to Ms. Witcher's testimony, however, Mother was incarcerated on October 16, 2017, for an indeterminate period of time. Assuming, *arguendo*, that Mother's incarceration on October 16, 2017, exceeded seven days, the relevant statutory period would be the four consecutive months preceding her incarceration, or June 16, 2017,

---

[6] The record does not contain a written order explicitly suspending Mother's visitation. Inasmuch as the permanency plans drafted after February 2017 refer to a court order suspending visitation, Ms. Witcher testified as to this fact, and Mother did not contradict this evidence at trial, we will proceed with our analysis under the conclusion that Mother's visitation was suspended due to continuing substance abuse issues.

through October 15, 2017. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2017); *see also In re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *4 (Tenn. Ct. App. June 23, 2015), *perm. app. denied* (Tenn. Sept. 25, 2015) (explaining that the applicable four-month statutory period "immediately preceding" a parent's incarceration ends on the day before the actual date of incarceration).

The record does not indicate that Mother was incarcerated at any point in time between June 16, 2017, and October 15, 2017, nor does it establish any other factors that may have prevented Mother from attempting or scheduling visitation with the Children. Mother did not testify at trial; therefore, the only evidence regarding her dates of incarceration came through Ms. Witcher's testimony that Mother had been incarcerated on October 16, 2017, for a period of more than one day. Ms. Witcher further related that Mother's most recent incarceration before October 16, 2017, occurred prior to June 16, 2017. Mother's argument that incarceration prevented her from visiting the Children during the relevant statutory period is unavailing. *See In re Audrey S.*, 182 S.W.3d at 864 ("Failure to visit or support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." (internal citation omitted)).

Although we recognize that Mother's visitation rights were suspended in February 2017 due to substance abuse concerns, this Court has held previously that when a parent has the ability to demonstrate a change in situation or behavior so as to warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit. *See In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014). This Court has applied this rule to circumstances when substance abuse issues cause a parent's visitation rights to be suspended and a showing of sobriety could have resulted in the reinstatement of those rights. *See, e.g., In re Mya E.*, No. M2012-02323-COA-R3-PT, 2013 WL 2106839, at *6 (Tenn. Ct. App. May 13, 2013), *perm. app. denied* (Tenn. Aug. 16, 2013).

Ms. Witcher's testimony demonstrated that Mother's ongoing substance abuse was the primary basis for suspension of Mother's visitation rights. The record indicates that Mother had not addressed these underlying substance abuse concerns or made any other efforts to reinstate her visitation rights following suspension. We determine that Mother's awareness of the steps necessary to reinstate her visitation rights and her inaction with respect to those steps constituted a willful decision to discontinue her visitation with the Children. *See Tenn. Dep't of Children's Servs. v. J.A.H.*, E2005-00860-COA-R3-PT, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005). We therefore conclude that clear and convincing evidence supports this statutory ground for termination.

B. Abandonment by Failure to Provide a Suitable Home

For the purposes of proceedings for the termination of parental rights, Tennessee Code Annotated § 36-1-102(1)(A)(ii) (2017) defines abandonment by failure to provide a suitable home as occurring under the following circumstances:

The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

For the statutory ground of abandonment by failure to provide a suitable home to be applicable, DCS must first prove that the Children had been removed from Mother's home and that the Children were found by the court to be dependent and neglected. *See In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *5 (Tenn. Ct. App. Sept. 30, 2014). Under this statutory ground, DCS must also have made reasonable efforts to prevent removal of the Children or to assist the parents in providing a suitable home. *See In re Kaliyah*, 455 S.W.3d 533, 553 n.29 (Tenn. 2015).

The applicable four-month period under this statutory ground would commence upon the time of each child's removal from the Mother's home. *See, e.g., In re Gabriel B.*, No. E2013-01581-COA-R3-PT, 2014 WL 1272201, at *6 (Tenn. Ct. App. Mar. 28, 2014). Alexis and Jaxon were placed into the custody of DCS on November 2, 2016, and

Jasmine was placed into the custody of DCS on June 6, 2017. Accordingly, the relevant statutory period for this ground for termination of parental rights is from November 3, 2016, to March 3, 2017, with respect to the eldest two children, and from June 6, 2017, to October 6, 2017, with respect to Jasmine. The trial court entered orders on October 4, 2017, finding all three Children to be dependent and neglected in Mother's care. Furthermore, in its January 19, 2018 order, the trial court found that DCS made reasonable efforts to assist Mother in establishing a suitable home during both statutory periods, but "despite the State's efforts, [the parents] have done nothing to change the situation that has led these children to being placed in foster care." Upon a careful review of the record, we agree.

According to the November 2, 2016 order granting DCS protective custody over Alexis and Jaxon, protective custody was granted due to allegations of, *inter alia*, environmental neglect and the parents' ongoing drug abuse. Ms. Witcher testified during the trial that beginning in November 2016, DCS (1) began scheduling therapeutic visits for the parents, (2) provided drug screens and pill counts, (3) began scheduling home visits, (4) developed a permanency plan that included a goal of returning custody of Alexis and Jaxon to the parents, (5) made referrals for alcohol and drug assessment treatment, and (6) made referrals for mental health assessment and treatment. Ms. Witcher further testified that notwithstanding DCS's efforts, Mother had not tested clean for her drug screens from November 2016 until the date of trial and Mother had consistently failed to submit herself for scheduled psychological evaluations. Mother had also entered and been discharged from more than one rehabilitation program and had not successfully completed treatment while the Children were in protective custody. The trial court noted in its findings that "[Mother]'s noncompliance was [to such] a degree that she had to be incarcerated to ensure the safe birth of [Jasmine]."

Establishing a suitable home for a child entails more than merely providing an appropriate physical location to reside. *See In re Navada N.*, 498 S.W.3d 579, 596 (Tenn. Ct. App. 2016); *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). A suitable home for a child requires a safe and stable environment in which the child may reside with a proper caregiver who can provide the appropriate care and attention necessary to meet the child's needs. *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017). Additionally, this Court has determined that "a parent's compliance with counseling requirements is 'directly related to the establishment and maintenance of a suitable home.'" *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)).

The record reflects that the primary cause for removal of the Children from the parents' custody was pervasive drug abuse on the part of both parents. The evidence presented during trial supports a determination that Mother made no effort in either four-month statutory period to change the situation that precipitated the removal of the Children or to establish a safe and stable environment to which the Children could return. We note that Ms. Witcher also testified that Mother had not maintained regular contact with DCS and that Ms. Witcher did not know the location or condition of Mother's residence at the time of trial.

The record clearly demonstrates that the reasonable efforts made by DCS to assist Mother in establishing a suitable home were met with substantial, if not complete, noncompliance. *See In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. Sept. 19, 2014) (explaining that whether the State's efforts are reasonable depends on circumstantial factors, including "the parent's efforts to remedy the conditions that required the removal of the children" (quoting *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006))). We conclude that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that Mother abandoned the Children by failing to establish a suitable home. We therefore affirm this statutory ground for termination.

## C. Substantial Noncompliance with the Permanency Plans

Tennessee Code Annotated § 36-1-113(g)(2) provides that a ground for termination of parental rights arises when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." To terminate a parent's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the requirements of the permanency plan:

> Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d at 548. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In*

*re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)).  Yet, we must determine compliance in light of the permanency plan's important goals:

> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored.  Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives.  We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

> *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at \*8 (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at \*20-21 (Tenn. Ct. App. Oct. 21, 2015).  The permanency plan requirements should also be "reasonable and related to remedying the conditions which necessitate foster care placement."  *See In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)).

The initial permanency plan, dated November 17, 2016, and ratified on January 4, 2017, was created concerning Alexis and Jaxon and contained separate requirements for Father and Mother.  Under this permanency plan and as pertinent to this issue on appeal, Mother was required to:  (1) resolve all criminal charges and not obtain any new charges, (2) complete a psychological evaluation with a parenting component and follow all recommendations, (3) complete a domestic violence assessment and follow all recommendations, (4) participate in and complete parenting education, (5) establish stable income and housing, (6) complete an alcohol and drug assessment and follow all recommendations, (7) submit to unannounced drug screening and pill counts and only test positive for prescribed medications, and (8) maintain weekly contact with DCS.  The updated March 21, 2017 permanency plan, ratified on May 3, 2017, contained substantially identical requirements and goals.  The revised permanency plan, dated June 28, 2017, and ratified on August 2, 2017, added Jasmine as a minor child under the plan and contained the same requirements for Mother with an additional requirement that she not consume alcohol.

Although the record does not indicate that Mother obtained new legal charges between November 2016 and the date of trial, she was charged with civil contempt of court on February 23, 2017, and incarcerated with release conditioned on participation in

a drug and alcohol rehabilitation program. According to the testimony presented during trial, Mother did not submit herself for a psychological examination at any time from November 2016 until the trial, despite having such examinations scheduled on more than one occasion. Although Ms. Witcher testified that Mother had completed two alcohol and drug consultations, Mother had never completed treatment. Mother had not successfully passed a drug screen since November 2016 and was incarcerated in the days leading up to the birth of Jasmine in June 2017 due to ongoing drug abuse. Ms. Witcher additionally explained that Mother had not maintained regular contact with DCS, and Mother's living situation was unknown at the time of trial. There was no evidence that Mother had ever completed a domestic violence assessment, participated in parenting education, or established stable income or housing. As Ms. Witcher reported, although the Children had been in custody for more than a year, Mother had changed nothing with regard to her circumstances.

Although the requirements of the permanency plans focused on remedying concerns with Mother's mental health, finances, and residential stability, as Ms. Witcher related, the most important goal of the plans was to remedy the problem of Mother's substance abuse. By failing to follow through with alcohol and drug treatment, failing to appear for a psychological evaluation, failing to obtain employment or a suitable home, failing to visit the Children, and failing to participate in parenting education, Mother's actions demonstrated substantial noncompliance with the requirements of the permanency plans, which we determine were reasonably related to remedying the conditions necessitating DCS's custody of the Children. *See In re Valentine*, 79 S.W.3d at 547. We conclude that the evidence preponderates in favor of the trial court's finding, made by clear and convincing evidence, that Mother's noncompliance with the permanency plans had been substantial. We therefore affirm this statutory ground for termination.

### D. Severe Child Abuse

Tennessee Code Annotated § 36-1-113(g)(4) (2017) provides that a ground for termination of parental rights exists when:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such

14

child, or any other child residing temporarily or permanently in the home of such parent or guardian. . . .[7]

Tennessee Code Annotated § 37-1-102(b)(22) (2017) defines "severe child abuse," in relevant part, as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . .

As this Court has previously explained:

[A] parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004)).

In the case at bar, the trial court relied on its previous order entered on October 4, 2017, for its determination that severe child abuse was a sufficient ground for termination of parental rights. In its October 4, 2017 order, the trial court found that Mother had subjected Jasmine to severe child abuse as defined by Tennessee Code Annotated § 37-1-102(b)(22) by exposing her to, *inter alia*, methamphetamine, THC, and unprescribed medication while the child was *in utero*. The findings of the trial court as adopted in its October 4, 2017 order indicate that Mother was aware of her pregnancy, continued abusing both prescribed and unprescribed substances throughout her pregnancy, and was incarcerated during the later stages of pregnancy to protect the baby's health. As the trial

_____

[7] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-1-113(g)(4), replacing the former language in its entirety with the following:

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

*See* 2018 Tenn. Pub. Acts, Ch. 875, § 11 (H.B. 1856). The amendment essentially eliminates the requirement that the victim of severe abuse be the child at issue or a half-sibling of the child at issue. *See id.* Inasmuch as the instant action was filed in October 2017, we will confine our analysis in this Opinion to the version of Tennessee Code Annotated § 36-1-113 in effect at that time.

court stated in its January 19, 2018 order, the October 4, 2017 order was a final order and was not appealed. Accordingly "the issue of severe child abuse [with respect to Jasmine] is res judicata and the Order is res judicata in this matter." Additionally, the court found that "it is also a sufficient ground pursuant to [Tennessee Code Annotated § 36-1-113(g)(4)] to terminate [Mother's] parental rights as it pertains to Alexis and Jaxon as they are siblings of Jasmine."

It is well settled that a trial court may rely on a prior court order finding severe child abuse and is not required to re-litigate the issue of severe abuse during the termination trial. *See In re Samaria S.*, 347 S.W.3d at 201*; State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). Mother concedes in her brief that "a trial court may rely on a prior court order finding severe child abuse as a ground for termination" and that "the trial court did not err in relying upon the prior adjudication of severe child abuse in the dependency and neglect proceedings as a ground for termination." Discerning nothing in the record to contradict the finality of the October 4, 2017 order, we agree. We therefore affirm the trial court's determination that this statutory ground for termination was proven by clear and convincing evidence.

### E. Failure to Manifest Ability and Willingness to Assume Custody or Financial Responsibility of the Children

The applicable version of Tennessee Code Annotated § 36-1-113(g)(14) (2017) provided that a statutory ground for termination of parental rights existed under the following conditions:[8]

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Although Mother has not appealed this ground for termination of parental rights, we address it *sua sponte* in light of the heightened burden of proof in termination proceedings. *See In re Carrington H.*, 483 S.W.3d at 524. Upon our careful review of the record, we determine that the trial court did not err in finding that clear and convincing evidence existed to support this statutory ground for termination of Mother's parental rights.

---

[8] Effective July 1, 2018, Tennessee Code Annotated § 36-1-113(g)(14) has been amended to substitute the phrase, "A parent," in place of "A legal parent." *See* 2018 Tenn. Pub. Acts, Ch. 875, § 12 (H.B. 1856).

This Court has recently explained the following with regard to this ground for termination of parental rights:

> Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*
>
> * * *
>
> We have made the following observations about what constitutes "substantial harm":
>
>> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.
>
> *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7-8 (Tenn. Ct. App. Apr. 4, 2018) (additional internal citations omitted). This Court has held that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child. *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018); *but see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (reversing

this ground for termination when parents were unable but willing to assume custody and financial responsibility of their children).

Mother had been consistently unable to assume financial responsibility for the Children since the time that they were removed from her home, having no ascertainable income from November 2016 through the trial date. Mother also failed to demonstrate that she was able to provide sufficient housing for the Children. Mother indicated a lack of willingness to assume custody or financial responsibility for the Children due to her inaction toward her responsibilities under the permanency plans as well as her previous statements made to DCS regarding the Children. Drug abuse and mental health issues were two primary reasons for the removal of the Children from Mother's custody. Mother was consistently noncompliant with any alcohol and drug treatment and never submitted herself to a mental health evaluation. Additionally, the trial court stated in its October 4, 2017 order that Mother "admitted to [Ms.] Witcher that she did not wish to stop using drugs and that she did not wish to go to inpatient."

We agree with the trial court's determination in its January 19, 2018 order that Mother has "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility for the children." Because Mother has failed to remedy the issues that brought the Children into DCS custody, we also agree that placing the Children in Mother's legal and physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the children." We therefore affirm the trial court's determination that this statutory ground for termination was proven by clear and convincing evidence.

F. Persistence of Conditions

The trial court also determined that the ground of persistence of the conditions leading to the Children's removal from Mother's home had been proven by clear and convincing evidence. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (2017) provides:

(3)     The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)     The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

18

(B)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

A prior court order adjudicating a child to be dependent, neglected, or abused is an essential requirement of a court's termination of parental rights upon the ground of persistence of conditions. *See In re Audrey S.*, 182 S.W.3d at 874. As this Court explained, the statutory ground of persistence of conditions "applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *See id.*

This statutory ground only applies to Alexis and Jaxon, who were adjudicated dependent and neglected more than six months before the trial court's December 20, 2017 hearing. As the trial court stated in its January 19, 2018 order when addressing this ground:

The conditions that prevent [Alexis and Jaxon]'s return to [Mother]'s home are that she does not have a safe and suitable home, and has not kept in contact with the case worker, has not made attempts to visit these children, or made any attempts to address the reasons why the Court suspended her visitation in order to regain custody and visitation of these children.

Furthermore, the Court finds that [Mother] has never submitted herself to a psychological evaluation to begin the process to remedy her mental health issues.

As previously discussed, the evidence preponderates in favor of each of these findings with respect to Mother's ongoing conditions of drug abuse and overall noncompliance with DCS's attempts to assist her in improving her condition and regaining custody. We therefore affirm the trial court's determination that this statutory ground for termination as to Alexis and Jaxon was proven by clear and convincing evidence.

## V. Best Interest of the Children

Mother contends that DCS did not present sufficient evidence to support the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. We disagree. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'" (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (2017) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

20

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

    When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must

21

remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court considered each statutory factor prior to concluding that those factors weighed in favor of terminating Mother's parental rights to the Children. With respect to factor (1), the trial court found that Mother had not made an adjustment of her circumstances that would make it safe or in the Children's best interest to be placed in her care. *See* Tenn. Code Ann. § 36-1-113(i). As the trial court noted earlier in its January 19, 2018 order, the Children "were brought into custody [of the State] due to allegations of drug use and abuse, unsafe home, unfit home, as well as an inability to provide for these children, but predominantly it was the issue of drugs." By the time of trial, Mother had not shown any financial stability, communicated the status of her living situation, submitted to a psychological evaluation, completed a drug

22

treatment program, or tested clean on a drug screen since DCS began randomly administering the tests in November 2016.

Likewise, with respect to factor (2), Mother was consistently noncompliant with DCS's efforts toward any lasting adjustment. *See id.* Ms. Witcher testified that mental health evaluations were scheduled for Mother on three separate occasions but that Mother did not appear for any of these evaluations. DCS also scheduled alcohol and drug treatment for Mother twice, with the result that Mother was discharged twice from treatment for noncompliance. Mother had not maintained contact with DCS. As the trial court ultimately determined, Mother had "done absolutely nothing to change [the] situation that led to the removal of these children and that [Mother] had the opportunity to do that." The evidence preponderates in favor of this determination.

Regarding factor (3), Ms. Witcher's testimony indicated that Mother had made no efforts to visit any of the Children from at least February 2017 until the date of trial. *See id.* The Children's foster mother testified that Mother had not called the Children in months and had never written to the Children or sent them a package. Similarly, with respect to factor (4), the trial court relied on the testimony of Ms. Witcher and Mr. Hill in finding that "there does not appear to be a bond or significant bond between the children and [Mother]." *See id.* Ms. Witcher also explained that Mother had shown little interest in the Children and further stated that she could not recall Mother's ever calling her to simply inquire about the Children's welfare. Mother had also failed to attend any school functions or doctor's appointments for the Children.

Concerning factor (5), the trial court determined that according to the testimony from Mr. Hill and testimony from the Children's foster mother, "the children are acclimated into [the] home with [their foster parents] to the extent that it would be detrimental to the children for that relationship and bond to be severed." *See id.* The trial court also found that the Children had developed a significant and substantial bond with their foster parents. Ms. Witcher testified that the Children referred to their foster parents as "mom" and "dad" and enjoyed a close and significant bond with them and their foster siblings. The evidence demonstrated that the Children were thriving in their foster placement and that many negative behaviors and developmental delays that had been present upon the Children's entry into foster care had been resolved by the time of trial.

The trial court stated that factor (6) was not applicable to the facts of this case. *See id.* We additionally note that there was no evidence presented with regard to factor (9), concerning child support payments by Mother. *See id.* With respect to factors (7) and (8), the trial court found, respectively, that Mother's "home is unascertainable due to her lack of contact with [DCS]" and that Mother "has not even attempted to do her

psychological evaluation" in addition to her noncompliance with alcohol and drug treatment. *See id.*

The trial court concluded its best interest analysis with additional findings related to the Children's status in foster care. First, the trial court found that according to the testimony of Mr. Hill, "it would be detrimental for [the Children] to remain in foster care" because the Children were in need of permanency. Second, the trial court found that the Children's foster parents would be able to provide that permanency. Finally, the trial court determined that the foster parents were appropriate adoptive parents for the Children. The evidence supports these findings.

Ms. Witcher testified that the eldest two children had made significant improvements regarding their development and behavior since entering the foster parents' home. Mr. Hill echoed such testimony with respect to the eldest child, who had disclosed experiencing incidents of violence, abuse, and environmental hazards when she lived in the parents' home. The foster mother likewise related that the eldest children were "really wild" when they entered her home and seemed unable to discern between right and wrong, often resorting to violence to resolve conflict. She testified that the Children were thriving in her home and that a significant bond existed between the Children and the foster family. The foster mother offered that she would "sign [adoption papers] today if they would let me."

Based on our thorough review of the trial court's ruling in light of the statutory factors, we conclude that the evidence does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. Having previously determined that statutory grounds for termination of parental rights were established, we affirm the trial court's termination of Mother's parental rights.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment terminating Mother's parental rights to the Children. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Lequita S.

_____
THOMAS R. FRIERSON, II, JUDGE

24